All right. Good afternoon. I'm Judge Tashima, and I am presiding over this panel today by default because the other members of this panel, Judges Thomas and Judge Fires, as you can see on the monitor, are appearing by a video hookup. This is, I guess I would call an emergency hearing on an emergency appeal in motion. We haven't ruled on the motion for a stay. So I think in this case, it's fair to say it's probably wrapped up with the merits. As you know, we've denied the stay in the habeas case. We are we the panel have have invited the the amicus to argue briefly. And I think parties have gotten the order permitting the following of the amicus brief. Amongst other things, the counsel for Mickey can think about addressing it. Argument is this. We have a line of cases that say the the court, as a general rule, won't address a separate claims made by an amicus and not made by a party. But I think it's a rule of prudence. And in this case, I think one of the questions is whether, you know, whether or not the claim of the Mickey, although it's also a First Amendment claim, is really the same or different claim than the claim of the claim of the the appellant. So I think you keep that in mind. So we'll hear from we'll hear from the counsel for appellant. And probably fair. Fair to hear from Mickey briefly after that. And then we'll give the state a chance to respond to both arguments. All right. Let's proceed. Good afternoon, Your Honor. Stephen Lublin on behalf of Donald Beardsley. Let me just make a sound check. One. Judges Pius and Thomas, you can hear the proceedings here. Yes, I can. Can you hear me? Yes. OK. We can hear both of you. So that's good. I'm sorry. Go ahead. Yes. Thank you, Your Honor. Mr. Beardsley's behalf. I want to thank the court for convening this session today so that we can be heard on this matter. What we are asking for, the modification of an execution procedure, is really nothing beyond the pale. As the court may have seen from the New Jersey case we cite, the court there sent, told the state their regulations for governing the execution process were arbitrary and capricious, sent the state back to rewrite them. They're doing that right now. In Kentucky recently, I'm told, an injunction issued in some litigation. And to settle that litigation, or in an attempt to settle that litigation, the attorney general in Kentucky offered to up the dosage of thiopental from two grams to three grams. Obviously, if you have a sense of what our case is really about, that's probably not going to settle the case. But the point is that there is nothing sacred about this or that particular execution method. It's just prison condition litigation, and it can be, any particular method can be litigated and modified as law and justice requires. What we have in our district court order, unfortunately, is no law, no evidence, and no justice. What we have, I submit, is we have a result in desperate search of a rationale, jumping from one rationale in the Cooper case, which had abandoned the legal case law basis, to a different rationale, in this case, the Reed case, which also does not avail the court, also does not support the ruling. Well, it seems to me the way I read it, the district court pretty much is saying there's not too much to distinguish this case from Cooper in terms of the 1983 action. Isn't that pretty much what it comes down to, Judge Fogle's ruling? Well, that is what Judge Fogle's ruling came down to. In the case of Cooper, it was a case of a different kind of litigation. Cooper presented, rightly or wrongly, a completely different equitable mix, where the complaint, an unexhausted complaint, was filed eight days before the execution, and the Court specifically found, rightly or wrongly, that a purpose of filing when they did was so that to save time so that Mr. Cooper could pursue his various successor remedies in State court, Federal court, wherever. That is not this case. Mr. Beardsley filed a fully exhausted petition in a timely manner. He does not have successor petitions pending. This is not about delaying anything. This is about ensuring that Mr. Beardsley is not executed in a manner that offends the Constitution. Mr. Luther, just to follow up on Judge Tashima's question, with respect to the evidentiary showing that was made here, it looks to me like the evidence is pretty similar to what was presented in the Cooper case. And I'm wondering, what are the material factual matters that you contend that the district court did not or should resolve in connection with either this preliminary injunction appeal or on the merits? Well, first of all, as a preliminary observation, our First Amendment claim asserting Mr. Beardsley's First Amendment rights was not presented at Cooper and does not hinge on the evidentiary showing in Cooper or here, really. In terms of the evidence that was presented in Cooper, the State court execution logs are common to both cases. I think they were given a slightly different spin in the Cooper case. I think they emphasized more the notion that five grams of thiopental may or may not be enough to properly sedate the inmate. They talked about a straight shot versus continuous administration and so on. So it's a question of spin. In some sense, it's a question of spin in advocacy and also the legal basis that the district court ultimately ruled on, all of which we distinguished and showed why it was wrong. The district court does not engage either in Cooper or in this case with the expert testimony, with Dr. Heath's expert testimony about what is to be gleaned from the execution logs, about Manny Babbitt, about, well, we don't have Stephen Anderson's log. We have percipient witness testimony about William Bonin and the extra dose of pancuronium bromide. And the Respondents, the Defendants, the Warden and the Director have done nothing to put Mr. Beardsley's mind at ease that he will die easy. They have not said Manny Babbitt, he will die easy. Here is why. Stephen Anderson died easy with the heaving chest up and down. Here is why. They've done nothing about that. Their expert testimony assumes proper administration and delivery, and they don't address that. There is simply no defense evidence about the efficacy of the administration and delivery of the thiopental. That only answers part of my question. The other part was what factual matters do you contend that the district court must resolve in order for you to prevail on the merits? Well, on our First Amendment case, I don't think, frankly, there's really anything that the district court has to resolve. We have shown that, and it's uncontested that pancuronium bromide will paralyze Mr. Beardsley, prevent him from crying out if he's not properly sedated, prevent him from informing the assembled witnesses of what's happening to him, prevent him informing the world at large from what's happening to him. There's really nothing about that claim to resolve. The district court applied the incorrect legal standard. Now, this is, as I said, a prison condition litigation claim, and normally those cases are pretty easy for the prison officials to win. They assert some security interest. They assert some penological justification, some rehabilitative interest, and they win these cases most of the time. And the defendants, the respondents, have come forward with absolutely no evidence about why the administration of pancuronium bromide is a legitimate penological objective. They have abandoned what they said in the Cooper case. There is nothing on this case, on that claim, that really needs to be resolved. We could file summary judgment papers on it tomorrow, practical. One of the things that bothers me about your position is that it all, all these potential unconstitutional effects depends on something going wrong in the process. Isn't that true? In other words, if things went according to the protocol, there would be no constitutional issues. You agree with that? I do agree with that, and I think the defendants would agree with that, that that's why they administer the pancuronium bromide, just because just in case something goes wrong, as we suggest it often has, no one will know. So in a sense, it is a content-based restriction, a classic offense to the First Amendment. And what about the I don't know if it's a finding or assertion, but in the you know, in the Cooper litigation, there was some statement about about the probabilities of something going wrong. You know, ninety nine point nine to the X power. It's almost like an only an infinitesimal possibility that something could go wrong. Right. Well, Dr. Dershowitz said that someone given a five gram dose of thiopentol, correctly administered and delivered over time, will ninety nine, et cetera, as you said, be rendered unconscious throughout the duration of the execution procedure. Dr. Dershowitz assumed proper administration and delivery. Dr. Dershowitz did not analyze the protocol and say that proper administration and delivery is anything like a foregone conclusion. He did not say trained people are doing this. He did not talk about who's mixing the drugs, who's pushing the drugs. He did not address the fact that it doesn't matter that the inmate is all alone in the chamber with a six foot tube running out of his arm with nobody monitoring it. He didn't address anything, probability wise, about administration and delivery. He didn't address whether or not the people doing the procedure are psychologically apt, which was looked at in the Webb case, the Connecticut case. He didn't address whether they're drug abusers, whether they're distributing painkillers to inmates. He didn't address any of that. He didn't address one thing about administration and delivery, except that he had been told by the AG that RNs and LVNs do the insertions. And anybody who's ever had blood drawn or had an IV or sat with someone in intensive care knows that that is the batting average for IV failure in needle sticks is pretty low. So that's the only way that. What would satisfy your constitutional claims? I mean, what kind of modification of the procedure? Well, the First Amendment claim would be satisfied by striking the pancuronium bromide from the procedure, which would not impact the process at all as far as I can tell. What about the Eighth Amendment claim? Well, I think the Eighth Amendment claim, it requires more disclosure. I think we don't know what to fix because we don't really know what's happening. I mean, we have perhaps model situations with the – I'm informed that there are other states where people are in the room. The Tennessee case that we cite, I believe there's a closed-circuit camera trained on the injection sites to make sure the needles don't pop out and the sedative spills on the floor. In the Connecticut case, they talked about the training of the people to the satisfaction of a physician and psychological suitability. So it's hard to know what we have to fix until we know exactly what's broken and why these California execution laws, according to our experts, say that something definitely is broken. Well, then let me ask you this. What's your allegation in the complaint as to what the Eighth Amendment violation is specifically? Let me see. The Eighth Amendment violation is an unacceptable risk that the condemned will be subjected to an unconstitutional level of pain. Through the process, by virtue of his not being properly sedated and then being subjected to, one, the paralyzing pancuronium bromide, which will cause the physical and psychological terror of suffocation, and two, the burning through the veins of the potassium chloride, which is ultimately the fatal ingredient in the cocktail. Why isn't that claim as well satisfied by the elimination of pancuronium bromide? Well, in terms of Mr. Beardsley being able to communicate that something was going wrong? In terms of any Eighth Amendment problem. In other words, if that drug is eliminated, presumably if something goes wrong, he would be able to speak out. Right? And presumably then, you know, whatever has gone wrong could be corrected. Well, that all assumes. Without the infliction of unnecessary pain. That all assumes knowledge of the timing and Mr. Beardsley's awareness of exactly what's going on and when, which is currently not clear under the protocol. Under the protocol right now, the inmate is hooked up to the I.V., the saline flow is started or the people leave the room and then the saline flow is started and nobody tells him when the saline flow is going to stop and the sedative is supposed to hit his system when the next saline flow is supposed to start and then the potassium chloride under your model would hit his system, and hopefully with him not being aware of it. So it's conceivable that if you take the pancuronium bromide out of the process and choreograph the process much more so that Mr. Beardsley knows what's supposed to happen and when and allow him a suitable interval in which to either inform the assembled witnesses or have someone monitor his level of unconsciousness, then that could conceivably solve the problem. But as things stand right now, just leaving him alone in the room, he could still be subjected to the potassium chloride, unsedated, as we note in the reply brief, as much pain as the veins can possibly deliver. The other point, getting back to Judge Paez's question, I don't know that it's necessary for us to get where we want to get on our equitable mix, but in terms of new evidence, we do have all the toxicology reports from Kentucky, North Carolina, South Carolina, Arizona, some of which it's clear that the blood was drawn fairly shortly after the execution had occurred. So that's a new mix of evidence that was not available to Kevin Cooper. The courts kind of go back and forth. The cases the district court relied on said, well, we don't care what happens in other states. And then, of course, now the district court reaches out to Virginia to say that everything's okay in California. So, I mean, I think I. Can any definitive conclusion be drawn from those toxicological reports as a whole? Any definitive conclusion? Well, I think both experts agree they are troubling, and both experts admit that you would want to know a little more information about the methodology, that there are variables, but it's conceded that this kind of data is troubling, and as I say in the reply brief, troubling things generally require further investigation. Now, I want to emphasize that it is not easy to get this kind of material, and that should be evident from the Attorney General's response to our informal discovery request. No, you can't have it. States aren't posting adverse toxicological reports on their websites. They're not handing them out to death row inmates. They're not handing them out to the death penalty bar. If there is discovery in litigation, it's all going to be subject to protective orders, and it's not going to come out. So, you know, we're lucky to have what we have, but it should be more than enough to satisfy the Court on the Eighth Amendment that there is something troubling going on in California executions. I think we have an accident rate, looking at the execution logs, that is troubling. When we speak of not being able to eliminate the risk of accident, I think of something like so many fatalities per, you know, hundred millions of air miles, I don't think of three or four blown executions out of eight. You know, the space shuttle had two horrible accidents out of a hundred rides, and that scuttled the program. Mr. Lublin, let me ask you a question about your First Amendment claim. Yes, Your Honor. Assuming that the first drug, the sodium theopentyl, works, and Mr. Beardsley is rendered unconscious, does his First Amendment right to speak still exist? His First Amendment right is somewhat metaphysical. Excuse me? Even if he's unconscious? Well, his First Amendment right to speak predates the administration of the sodium theopentyl. If what you say occurs, then fortunately, blessedly, under the circumstances, he won't have anything to say, and that will be a good thing, as good a thing as there can be under these circumstances. But the right to speak is not contingent on the sodium theopentyl failing. That is the circumstances under which he would be motivated to speak, just as anyone is motivated to speak under certain circumstances to press their particular issues and viewpoints. And the pancuronium bromide prevents Mr. Beardsley from speaking under the urgent circumstances that he would be placed in. One other question. Is there any First Amendment expression in his body, assuming there is, an involuntary reaction to the potassium chloride, involuntary movement? I'm sorry. Is there any kind of form of First Amendment expression? Well, I don't, I don't, if you're hearkening back to one of the rationales advanced in Cooper and abandoned here, I don't think we could say that if Mr. Beardsley is unconscious, that he has a First Amendment interest in displaying his unconscious tics. I'm not sure about that. What I would say is that under the First Amendment coalition case, the State's desire to prevent the assembled witnesses, the media, the public, the decision-makers in our government at large from viewing these involuntary tics, which might be unpleasant to look at, out of the rationale that it would confuse people and upset them, that's unacceptable under the First Amendment coalition case. Strictly, maybe strictly speaking, Mr. Beardsley doesn't have the right to assert that everyone should see just what happens even in an execution that goes according to Hoyle and goes properly because you could still be grossed out and offended by that. You know, it's difficult to say, but I don't think it's acceptable to say, well, they can get away with that even though it's clearly unacceptable under the CFAT cases. You have about 11 minutes left. I mean, you want to give a few minutes to the amici and then reserve the rest for rebuttals? Yes. Well, I did. I just wanted to talk a little bit about timing. I wasn't quite sure if the Court had concerns about the timing of this litigation versus the Cooper litigation. We make the point that our case is different from Cooper. As I said, we're not filing at the last minute to play games. We're not filing at the last minute so Donald can, you know, be around for the Super Bowl. What we are doing is we filed a properly exhausted complaint under the California Code of Regulations. We filed a ripe Federal complaint under Stewart v. Martinez Villarreal about an execution, time of execution case. We filed everything correctly under the law, and so timing is not an issue in this case, and it certainly shouldn't be used to detract from the showing that we put on the merits, both from California and from problems in other states. So I will reserve some time now. All right. Thank you. Thank you, Your Honors. Alan Schlosser, appearing for amicus, American Civil Liberties Union of Northern California and death penalty focused. We filed this amicus brief because we believe that the First Amendment right that was recognized in the CFAC case, the right of the public to have accurate information from meaningful witnesses of an execution, is at serious risk. To address the question that the Court posed at the outset, I think that there are several factors that make it important that this right be before the Court as it considers the claims that are before it. One is that in considering an injunction and considering whether to exercise the equitable powers of this Court, one of the factors is the public interest. And I think as is indisputable and was the subject of much discussion in the CFAC litigation, the public has a very strong interest in getting accurate information about executions and in particular, accurate information about what is certainly the most critical piece of information, whether executions are being carried out humanely. And that's firsthand observation of this process and the reaction of the person affected. And that is independent of anyone's views on capital punishment. The First Amendment is important and operates whether Donald Beardsley dies a painful death or a painless death. The fact is that the First Amendment requires that that not be distorted by state action. And that public interest that was at the heart of the CFAC case is also involved in this case, because you're being asked to consider an injunction. I think also the First Amendment, the claim, the assertions that we're making about the right to know should be kept. This Court should be mindful of them as they're considering Mr. Beardsley's claims, because there's always a connection between, although this is a different context than a normal speaker-audience context, but when one is asserting the right to speak, I think it's very relevant to point out the importance of that speech to a willing audience. And First Amendment cases addressing rights of speakers take into account the importance and significance of the speech to the audience. And I would contend that whether what happens is that there is expressions of pain or not are relevant information for this audience, for the witnesses and for the public. I think the third reason is that the Court should be mindful of the possibilities that the information is being distorted, that important information is being blocked in considering the Eighth Amendment claims. The best example of that interplay is Judge the Fierro case when the Court considered lethal gas injections, and in her decision, Judge Patel pointed out that the observations of the movements of Robert Alton Harris and certain movements of his throat were the best evidence that lethal gas was slow, painful, and torturous. If the state had decided to administer pancuronium bromide, those movements may never have been apparent. There's one point that I think is perhaps the most important and distinguishes this case, certainly from CFAC and I think also from the Cooper case. Why we feel the First Amendment is at such risk and why this Court should be very concerned about, on this record and on this district court record, allowing this execution to proceed, is that state is making, has not explained at all and has not justified at all the use of this drug. The fact that Judge Vogel relied on a small possibility, a small risk of pain, but that is clearly not the case. It's clearly not dispositive of the First Amendment right, certainly. I think the record is not refuted, and no one would disagree, that if there are problems, that there is a possibility of pain, that if the first drug does not work properly, if the administration apparatus doesn't work properly, there may be pain and this drug will serve the purpose of masking that pain. What I think of critical significance is that under the First Amendment doctrine, the state should be putting forward some legitimate state interest in using this drug, just as they would have to if they decided to administer this drug when they were using lethal gas. And yet the state has not done that. So this Court is being asked to reject this request for a stay and prevent any discovery. Well, that's not going to happen. Well, the state is, in fact, keeping it secret from the public and from this Court why this drug is being used. It is not wildly speculative and to really say that this drug appears to have no apparent purpose except to mask the possibility of pain and movement that might be unpleasant and unsightly. If I could make one other point, Your Honor, and I may be pressing my time here, but I think there's one other thing I want to stress. The fact that this case is before you with a focusing on the use of this drug, with the state not justifying its use and only arguing that there's no risk of pain or no reasonable risk of pain, and with the district court accepting that as legally sufficient, it really raises the specter of whether there's an improper motive here. In the CFAC litigation, one of the important findings after trial was evidence showing that one of the motives of the state was to prevent the witnesses from seeing some of the preliminary parts of the process, including efforts that might have to be made to subdue the inmate. And that could be misinterpreted. And both the district court and the Ninth Circuit affirmed that as an improper motive. I think on this record and in the absence of any evidence justifying the use of pancuronium bromide, this Court must take that very seriously. That what we're dealing with here is an attempt to sanitize the process and an attempt to distort the debate. I think I'm mindful of the way it can be distorted, even if there aren't expressions of pain. The first execution that took place under this Procedure 770 of William Bonin, after the curtain was parted, and that's why it was challenged in that case, but after there were the witnesses, there were the witnesses, there were the witnesses, and there was the witness observation, the newspaper accounts of that execution talked about how serene and motionless William Bonin was, which fit into the idea that was important to the legislature and to the people that lethal gas should not be the method of execution, but that lethal injection should be. Now we know from the facts in this case that, in fact, a second dose of pancuronium bromide was a lethal injection. And it was a lethal injection that was administered to Mr. Bonin. We don't know why that was done. And with the use of this drug, with no apparent purpose other than to mask pain, we don't know right now whether the stillness of Mr. Bonin was due to the fact that it worked properly or whether he was in excruciating pain and it was masking that pain. We think that that is why on this record it's not enough that other courts, as cited in some of the cases, have apparently said that executions can go forward using this drug. I think on this record it's imperative for this Court to go further. And just as we were able in the CFAC case to discover important evidence in the form of a memo by the warden which explained why they were using a curtain, this Court does not know, none of us know, whether a similar memo is in existence explaining the use of this drug. There's a hint in Dr. Dershowitz, the State's expert declaration, that, in fact, it is the purpose of this drug. Dr. Dershowitz says that without pancuronium bromide there could be movements that might be misinterpreted by the witnesses. That point is not being pressed now, but it is there. It is part of this record. And I think that going forward would disserve the public interest and the important constitutional rights that are at stake here. We'll hear from the State. And then, Mr. Lubliner, I'll give you three minutes for rebuttal, all right? Thank you, Your Honor. And may it please the Court, I'd like to begin with the Eighth Amendment claim, then turn to the First Amendment claim, first as presented by Mr. Beardsley and then by the amicus this afternoon. And I think the best place to start with the Eighth Amendment claim is with the question that Judge Toshima asked at the beginning of Mr. Lubliner's argument, and that is to what extent is this different from the case that was presented in Cooper in February of last year? The district court in this action identified this Court's opinion in Cooper decided in February of 2004 as the point of departure for any analysis of the claims that were presented by Mr. Beardsley. And the district court found here that the showing that was made in this case when compared to Cooper was materially indistinguishable. So the issue, I think, appropriately on the Eighth Amendment claim is whether Mr. Beardsley can demonstrate that the showing he has made in support of the injunction he's requested is sufficiently distinguishable from the showing in Cooper that the denial of the injunction here was an abuse of discretion, despite this Court's holding in the Cooper case. And he does not make that point. And the district court found, based on the evidence presented in the Cooper record, all of which is in the record here, that within a minute of the injection of five grams of sodium pentothal, the first drug that is used in the California protocols, that virtually all persons, the statistic was as presented by Judge Toshima, 99.9, followed by 12 nines, percent of the population would stop breathing . With that showing, there is no likelihood that Mr. Beardsley is going to suffer any pain as a result of the subsequent use of the Pavilon and the third drug, the potassium chloride. Now, if there is anything which distinguishes this case, the showing that Mr. Beardsley's made, in any meaningful way from the showing that was made in the Cooper case, it has to be in the declaration of Dr. Heath, the ubiquitous expert who, as the Court is probably aware, has appeared as the plaintiff's defendant's, the expert for the inmates in pretty much every one of these challenges across the country over the past year or so. Now, in the Cooper case, Dr. Heath argued that the use of the five grams of sodium pentothal would be insufficient to ensure unconsciousness throughout the execution process, because it was given in a single dose. And he argued that it would require a continuous infusion of the drug to ensure that the defendant would not suffer pain from the subsequent drugs being given to him. In this case now, in the Beardsley case, in the declaration that's before the Court, Dr. Heath concedes that the five-gram dose used in California is in and of itself lethal and more than sufficient to cause unconsciousness and death. It is independently lethal. It will be given to him, and he will, as the Court found in Cooper, almost immediately be rendered unconscious, incapable of experiencing pain. So the question then becomes, according to Dr. Heath and the showing that they've attempted to make here, is whether there are any ‑‑ there's anything in the procedures that are used or in the past executions to suggest that there would be a problem in the ‑‑ with the presentation of the five grams of sodium pentothal, such that one could argue that there is a possibility that it won't be sufficient to render him unconscious and he may suffer pain, that there is some risk of pain in the execution. Now, what Dr. Heath said in the Cooper case was that he had looked at ‑‑ he had concerns about California cases. He had looked at the execution logs from prior California executions. He says the same thing in this case and says, well, I've looked at them, I've looked at these numbers, I think something may have gone wrong. He doesn't tell us what. He doesn't explain how that in any way suggests that any of those inmates was, in fact, conscious at the time the second and third drugs were given to him. There's no explanation or demonstration of pain and suffering. In the Cooper case, Dr. Heath referred to the anecdotal declaration of a witness to the Anderson execution. He refers to that here, too, and again, without any explanation as to how that demonstrates that, in fact, the drugs didn't work or there was some breakdown in the procedures. In the Cooper case, Dr. Heath perceived gaps in the procedures for the implementation of the execution using the protocols that are at issue in California. He raises the identical complaints in this case that he raised in the Cooper declaration. And in that case, the Court did not find those complaints about the possibility that something might go wrong sufficient to override the showing that was made that the sodium pentothal will render him unconscious. There has been no effort to demonstrate in this case how that implicates any of the protocols and the concern that something might go wrong implicates any of the previous injection executions in California or to show that any errors actually occurred. It is, at best, speculation, and it is indistinguishable from the showing that was made in Cooper. This Court found in Cooper that there was no showing of an unnecessary risk of unconstitutional pain or suffering such that the execution should be enjoined using the existing protocols, the same protocols at issue here. That showing was based on the Heath declaration, as is this showing. And it's worth emphasizing, I think, that the burden is on the Petitioner, not on the State. The burden is on the Petitioner to demonstrate that there is a probability that he is going to suffer unconstitutional pain. He hasn't made that showing. Now, what does he attempt to add to the showing of Cooper to say somehow this is different with respect to the possibility that something will go wrong? The only distinguishing factual allegation between the Cooper litigation and this case are these autopsy reports, not from California, but from other states, without a showing as to how the protocols of those states were identical or sufficiently similar to California to allow us to draw any inferences from what happened, without any showing as to how the blood in those cases, the blood samples which they say show what he believes, what Dr. Heath is concerned may be a low amount of sodium pentothal left in the blood after the completion of the execution. There's no showing as to where they were drawn from, how they were drawn, how long after the execution, the procedures that were used. There is not even an explanation in Dr. Heath's declaration as to why those blood levels demonstrate something significant that ought to cause us to pause and have doubts about the adequacy of the sodium pentothal. Are there any similar type reports available in California? No, there are not, Your Honor, because California does not conduct an autopsy of the inmate after the execution. There are no autopsy reports. There are no toxicology reports. And I think it's worth adding that this showing, this attempt to add in to the showing that Mr. Beardley is making, this additional information, that showing was made in the litigation in the Reed case in Virginia. We've quoted that in our brief, and that was referred to by the district court, and the district court there found that without more information about the significance and the manner in which this evidence was obtained, it would have no value in determining whether the inmate might be unconscious or conscious during the course of the execution. It's important to note that Dr. Reed, excuse me, that Dr. Heath was the expert for the plaintiffs in this case. In the Reed case, he made those allegations. He has not responded to the findings in the declaration in this case that were made by the Virginia court as to why that information wasn't sufficient, why that information had any significance that would allow us to distinguish this case from the Cooper case. We cannot. Mr. Gillette. Yes, Your Honor. Can you hear me? I can, Your Honor. Okay, let me, let me, I have a question for you regarding, I realize it was Mr. Beardley's application for a temporary restraining order, and he bears the burden on the showing, but I was somewhat surprised by the State's response, especially with respect to the district court in the Cooper case and in this case, that it's incomplete. And I'm just, I was curious if that was, was that an accurate statement on their part? Is there some part protocol that we're missing? I believe that the entirety of the publicly available protocol, and I don't know if there's anything more to it than what's been released to the public on the website of the Department of Corrections, and through discovery in at least one hand, the habeas corpus case in the central district, if there is anything more. The complaint that Mr. Beardley has with the protocols is that he thinks there are additional questions that we should answer. We should fill in some blanks, that we should put his mind at ease. The problem is that until such time as he can demonstrate, that he can carry his burden of demonstrating, that there is any probability that the use of the sodium pentothal will be inadequate to render him unconscious or that it will be a burden on the district court to be done in an adequate manner or that it has in the past, and the showing that he's made using these various execution logs from California and information from other states isn't sufficient to get to that point. Well, I was just curious why the state just doesn't come forward and explain the way in which it monitors the administration of the first drug, the sodium pentothal, for example. Well, I think the protocol demonstrates that the... Well, the protocol doesn't demonstrate. I've read it from beginning to end. It says that the drug is given and then the second drug. After the catheters are attached, there's a line that's installed that goes outside the chambers, I understand it. That's correct. Then I'm just curious, how has it been administered and how is it monitored outside the chamber? And how is the defendant, his own heart condition monitored from outside the chambers? I'm just curious why the state didn't come forward and explain all of that, answer questions. I think that latter point with respect to the heart monitoring is demonstrated in the protocols, and if it's not, it's certainly inherent in the existence of the execution laws. There is a heart monitor that is attached to the inmate while he's in the chamber, and that is hooked up prior to them closing the chamber after all of the catheters are installed, and that is monitored by a physician during the course of the execution. And it's that monitor which then determines that the heart is stopped and at which point they can pronounce the inmate dead. So there is, in fact, it's those protocol, it's those execution laws that Dr. Heath attempts to draw some significance from by arguing that, well, the heartbeat went this way or it went up or it went down or whatever. That's all off of those reports that are completed by the physician who is monitoring the heart during the execution. Well, it sounds from your statement that there's more to Procedure 770 that apparently the warden considers confidential and is not disclosed. I think there are portions. I'm sorry. I didn't mean to interrupt. I believe there are portions that have not been disclosed. That's correct. Okay. Mr. Gillette? Yes, Your Honor. Would you move ahead to the question of the administration of the second drug, the pancurium bromide? What is your explanation for the compelling state interest in the administration of that drug, given your assertion that the sodium pentothal will render the inmate unconscious and we know that potassium chloride is a killing agent? The California protocols provide for the completion of a lethal injection pursuant to state law by the use of the three drugs. And it requires first the use of the sodium pentothal and then the pavlon, the pancurium bromide, and then the final drug, the sodium chloride, which stops the breathing. And there's been a great deal of criticism about the failure of the state to provide a justification. There seems to be the assumption that there's some bad faith involved. We haven't been put to the task of explaining or justifying that. The defendants have not, because the plaintiffs, a plaintiff has failed to date, as they did in Cooper, to make a showing that the use of that drug will impinge upon any constitutional right, because he cannot show that there has been or there will be a violation of his rights because he will not be rendered unconscious by the initial injection of the sodium pentothal. And in fact, this whole argument about, and we can move now, I think, to the First Amendment argument, the suggestion that somehow the use of the, I'm sorry, did Mr. Yes, I'm trying to give you the opportunity to explain your position. I don't think that. I've heard an explanation. We know there isn't one. You indicate that you haven't made it because they haven't made a threshold showing. That is correct. What is the state's position about the use of the second chemical? The state's position is that it has been determined that this particular combination of drugs is an appropriate one to use for the purpose of completing a lethal injection execution under the law. And absent a showing that it's unconstitutional to do it in that manner, with those drugs and in that order, then the defendant, the plaintiff is not entitled to obtain an injunction against the execution going forward using those three drugs. When you say, when you say determined, Mr. Gillette, you mean it was determined by Ward and Vasquez? To be honest with you, Your Honor, I'm not sure if it was Ward and Vasquez himself or if it was part of the Department of Corrections' attempt to implement the state law that was enacted in 1992, making lethal injection an alternative available method of execution, and since 1996 the default method of execution. It's certainly based upon the experience of other states.  Let me ask you this. What's in the record besides the former warden's deposition that would shed light on, you know, when you say it's been determined by the state that this is a way to implement the statute, and what went into that determination? There is nothing. The plaintiffs didn't put it in, and we were not, in response to the motion for a temporary restraining order and preliminary injunction, we were not put to the task of answering that question. I should say the defendants were not put to the task of answering that question. So as far as you're concerned, I mean, whatever deficiency in the record there might be on that, it's the plaintiff's obligation to, you know, make the showing. I think that if there's any deficiency in the record on that ground, it's because they failed to make the showing necessary to get to the point of questioning whether the pancremonium bromide is, in fact, an essential part of the execution protocol or will cause any pain in its use. And I think one point we ought to make about this First Amendment. No, no, no. Wait a minute. I think there's – maybe you can read it a different way, but there's certainly evidence in the record that it's not a necessary part because, one, you yourself said the first drug itself is, if administered properly, is lethal. And certainly the third drug is lethal. In fact, I mean, that's the purpose. I think in your paper you say the third drug that really is designed to kill, right? Each of the drugs is independently lethal. So if both of those are designed to kill, then what's the necessity of the second drug? Well, each of the drugs is independently lethal in the amounts that are given. And the state has determined that it's that combination of drugs which will ensure that the lethal injection execution will go forward in the most efficient and quickest manner to ensure that it's done consistent with the constitutional responsibility not to impose unnecessary pain and suffering. So part of the purpose is to make sure that the process will go forward in an orderly manner. Is that what you said? That it's a part of the process. Each of the drugs given – I know. But see, we're talking in circles. I know it's a part of the process. The question we're asking is why. I don't think we're at the point of having to answer that question, Your Honor. All right. So you don't want to give us an answer to that. You don't have an answer to why. I'm not in a position to represent on behalf of the defendants all of the reasons why that might be justified because I don't need to do that at this point. Can you give us one? I don't – no. I'm not prepared to make a representation on behalf of the clients to whom I have not – with whom I have not discussed this in any detail because I'm not put to that task yet because they have not been put to that task yet because they haven't satisfied the fact that coming in this late in the day, all that they have been able – they have not been able to show that there is any chance that using those second or third drugs is going to cause pain and suffering. And I think with respect to the argument that the Pavlon is going to somehow interfere with the First Amendment right, the problem with that argument is that if, as their own expert says, that first drug is independently lethal, and the reason that we've been discussing today, he's going to be unconscious as soon as that drug is delivered. And I think that question came up during some of the earlier arguments about the existence of the First Amendment right. He's going to be unconscious. The Pavlon is not going to do anything in that regard. Now, if the question is, and let me turn for just a moment to the amicus arguments made by the ACLU, I think they're either irrelevant or they're untimely. Now, to the extent that the amicus are seeking to vindicate the First Amendment rights of Mr. Beardsley, they're going to rise and fall on the showing that Mr. Beardsley's made. And because he cannot make the showing any more than Cooper could, that there's any probability that he is going to suffer pain after the imposition of the first drug, then there's no independent issue here for the ACLU to be arguing about. But if what they're arguing, as they seem to be, that they have some independent standing, some independent interest, I think it's a little late in the day for them to be coming in and imposing that upon us. Now, we get this brief from them the day before the argument and a week before the execution. They certainly know how to litigate these claims. If they think that they have a third-party interest that will allow them to establish a basis in a lawsuit for preventing the State from either using any of these combination of drugs or from using specifically the Pavlon, they can bring that lawsuit. They demonstrated in the CFAT case that they know how to do it. If what they're arguing, as it appeared to me from the argument today, to be saying don't use the Pavlon because it might mask our ability to determine whether there's pain and suffering from observing his motion and his movements, if what they're saying is we don't really care so much what happens to Mr. Beardsley, but we want to gather evidence for the next lawsuit, that's not appropriate. Their reason for being here is either to support Mr. Beardsley, which they can't do because he can't make that showing, or they're too late in the day. And if they want to make these arguments, let them bring their independent lawsuit. They simply do not have an independent basis for coming in now. To the extent that they have any interest in the case, it cannot trump the interest of the State in executing this 21-year-old judgment if they cannot make a showing that is any better than the one that Mr. Beardsley has made. And Mr. Beardsley's showing is not any better than the one that was made in Cooper. And in Cooper, the Court found that there was no reason to believe that Mr. Cooper, nor in this case Mr. Beardsley, would not be rendered fatally unconscious by the initial drug. He will not experience pain, and thus there would be nothing for him to describe. There would be no First Amendment violations. Unless the Court has questions on those issues, I can comment briefly on the standing, if the Court's interested. I think that's covered by the briefs, and I don't feel the need to expand upon that to any great extent. No, I guess not. Mr. Gillette, you're kind of putting us in an awkward position with respect to the primary argument on the administration of the second drug by not offering any justification for it, because we're resting now on a record where they have raised some questions, and the degree to which those are persuasive or not, we'll have to consider, against no justification in the record. But I think the problem... I understand your argument. I'm just commenting that. I appreciate it. I'm trying to give you another opportunity here to explain the use of the drug when some other states don't use it. Twenty-six of the, I believe, 36 states that use lethal or authorize lethal injection as a method of execution use the precise combination of drugs in the same order as California. Now, some, for example, Virginia only uses two grams of sodium pentothal to start. We use more than twice that much, the five. No court to date has found that that combination of lethal drugs is unconstitutional. No court has stayed in execution based upon a claim that it's inappropriate to use the Pavlon in combination with the other drugs. These claims have been made over and over and over again, and none of them have succeeded at any state or Federal court. I think the problem, and I understand Your Honor's concern. I appreciate that. But the problem is not one of my making. The problem is one that the plaintiff has made by coming to this Court so late in the day. The argument has been made that we didn't really delay it. Well, they did delay it. This whole attack on lethal injection and lethal gas, excuse me, lethal injection could have been made earlier in the habeas corpus. There was a claim challenging lethal gas, and it also included lethal injection in the original habeas corpus petition, and it was effectively abandoned. No effort was made to prove it. It could have been brought at an earlier time. For at least the last year and a half, every death row inmate and attorney handling these cases across the country has known about these issues. They've been raised over and over again, and yet we don't get it until just before the execution schedule, until just before the execution of this case. So is it your position that this type of claim doesn't require administrative exhaustion? Oh, no. No, it required administrative exhaustion. There's no question about that. But that's required by the Prison Litigation Reform Act. Does that apply to habeas proceedings, the Prison Litigation Reform Act? The Prison Litigation Reform Act would not apply to habeas proceedings. It would have to exhaust the state court. You just said he could have brought this as part of the habeas case. And he did bring it in the state habeas. He exhausted it in state habeas. Is it your position that then administrative exhaustion is not required? In order to bring the claim in federal habeas corpus, he would have to exhaust it through state collateral review proceedings. If he did not do that, he couldn't bring it into federal habeas. But in this case, Mr. Beardsley did exhaust those claims. If he wants to bring it as a 1983 action, he has to exhaust the administrative procedures. That's required by the Prison Litigation Reform Act. Now, in connection with that, I remind you now that, you know, you never responded to the appellant's argument that there's a Department of Corrections regulation that prohibits, you know, bringing administrative challenges to anticipated actions. What's your response to that? I know that they come to brought the administrative complaints earlier. Well, I'm not sure quite what he means by that. I'm not entirely familiar with that regulation. But I do know that this is a claim that he could have presented. He certainly could have presented this at an earlier time, because certainly once he got past the initial affirmance of the California Supreme Court, he had a presumptively final judgment. And at that point, he would be in a position, because he knows that unless he affirmatively selects lethal gas, he'll be executed by lethal injection. He could have sought to exhaust those administrative remedies. And even here, he waited to do it until after the date had been set for the time that had been set for an execution date. And he made no effort to do it earlier when he certainly could have done so, when he knew that that was an issue in the Cooper litigation. Cooper had not exhausted his administrative remedies. That's not the reason why his injunction was denied, though that's why ultimately the complaint was dismissed without prejudice. And that, of course, has not yet been refiled. Do you have some other questions? I guess not. Thank you, Your Honor. Thank you. All right. Let's hear the appellant's rebuttal then. Thank you, Your Honor. Your Honor, I think the Court perceives how we would characterize the showing that the defendants and the respondents have made in this litigation. It's not one of fact, and it's not one of law. It is to provide comfort. It is comfort and arrogance. Comfort, go along with all the other cases that haven't stepped up and tried to address these issues on the merits. Go along with the cases in Texas and Arizona and Florida and the Southern Death Belt. And arrogance in saying we don't have to tell you what happened to Steven Anderson. We don't have to tell you what happened to Manny Babbitt. Arrogance in saying we don't have to tell you how this execution is going to be conducted or who's doing it or what their training is. The ultimate arrogance in not telling us what the pancuronium bromide is for, if anything. Arrogance in saying we don't concede that there's a possibility of accident in this procedure when we know that there's a possibility of accident in all human endeavor. No law. The First Amendment proposition that they advance, that the district court accepted, was completely devoid of authority. They cite no cases for it. The district court cites no cases for it. It makes no sense. As we said in the papers, as I said below, if you had a prior restraint at a state university against publishing on a controversial subject, the chancellor couldn't get up and say, well, you know, I interviewed Professor so-and-so, and I don't think the man's going to have anything interesting to say. So we don't have a First Amendment problem here. There's just no law for that proposition. It is completely counterintuitive. I think some of the AG's responses here demonstrate, especially on the Eighth Amendment claim, the need for discovery. They admit that there are things that we don't know that aren't publicly available. If you've looked at the protocol, it's clear that it ends just as things are getting going, pretty much, in the execution process. Their position boils down to trust us, and they have basically given us no reason to trust them. They are in line with a whole sad history of intermixing government junk science and disempowered people, whether it's the Tuskegee syphilis experiments or the forced sterilization of the mentally retarded in the interest of science. All of this stuff eventually came to light through judicial intervention. There is really no reason for us to trust them. Just on the point of how these procedures are adopted, I think if you looked at Warden Vasquez's testimony that we cite in the exhibits, it's clear that this is all very, very informal. There's nothing certainly comparable to kind of an FDA level of testing and scrutiny. I watched the other night the documentary, Mr. Death, about Fred Leuchter, a man who made a career out of building execution procedures. His father was in the Tennessee, I believe, Department of Corrections. He was an engineer, and he was asked to work on an electric chair, ostensibly to make it more humane. And what he said about his whole career was interesting, and he seemed bemused by it. He said, because I built an electric chair, they thought I could build lethal injection equipment, and because I built lethal injection equipment, these states thought I could build a gallows, and because I built a gallows here, this state thought I could work on a gas chamber, and so on. There's just borrowing without much scrutiny, and it's consistent with the old-style stuff in the documentary where people were drawing pictures of each other's electric chairs and building mock-ups. There's just no level of openness. There's no level of testing. I think we've made the claim that we have demonstrated error in the California execution laws through our expert testimony, evidence that they have not bothered to rebut, either in Cooper or here. This distinguishes this case from all the other cases that were initially cited in the district court that they rely on, where they're essentially speculative cases. No executions have been conducted, or maybe one execution had been conducted and there was no available information about any problems. Here we have four execution laws, fifth with Steven Anderson. It's an incredible percentage of procedures that are malfunctioning. As far as the First Amendment goes, I think it's open and shut. I know it's difficult, and the court is uncomfortable with, perhaps uncomfortable with intervening in an execution process in a chemical matter, but there's really no difference between administering the pancuronium bromide or turning off the light in the gas chamber or drawing a curtain over it or taping Mr. Beardsley's mouth shut, putting a hood over his head, and strapping his head down so he can't communicate. It's the exact same thing. Well, there is a difference, and that is if you're interfering with the administration of a chemical. For example, if we were to reverse the denial of preliminary objection just with respect to the administration of the second chemical and the execution went forward, we really are tinkering with a process of which we know a little about based on this record. That's a little bit different from saying that you have to have the curtain open. Well, I think the process, broadly speaking from First Amendment purposes, includes the curtain in front of the window that was found offensive in the First Amendment coalition case, and it includes the chemical veil in here that is interposed for the exact same reason, to prevent the public, to prevent Mr. Beardsley from expressing himself and to prevent the public from seeing that the process didn't work. I guess my point being that we have no idea, not being chemists here on the circuit, of what exactly the protocol or what other unintended consequences might occur if we were to enjoin in a preliminary fashion the use of the second chemical and allow the execution to go forward next week. Well, there's never been any suggestion in Cooper or here that removing the chemical from the protocol would have any adverse impact on Mr. Beardsley and render his execution less humane. Pancuronium bromide is not another form of sedative. It's a paralyzing agent that causes intense suffocation. There's been no suggestion that if you take pancuronium bromide out, that somehow there would be some interaction between the potassium chloride and the saline and the sodium thiopental. There's been no suggestion like that, and I think if that were there to be made, you know, they would have come forward and said it. They wouldn't tell us why they're administering pancuronium bromide in good faith, but they would certainly come forward and say, no, no, no, you can't take the pancuronium bromide out because it would be cruel to Mr. Beardsley. And they certainly haven't said that. Does the Court have any further questions? I don't think so. All right. I want to thank all counsel for your argument. Thank you, Your Honor. It's been very helpful. We know there's not a lot of time and there's no stand effect now, and we also know that in these cases we're not the last word. So we will do our best to expedite our ruling. And with that word, we'll stand adjourned. Thank you. Thank you.
judges: Thomas, Paez, Tashima